### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Giuseppe B. TOME, Paolo Mario Leati, Lombardfin S.p.A., Trasatlantic Financial Co., S.A., Nayarit Investments, S.A., Finvest Underwriters and Dealers Corp., Certain Purchasers of the Common Stock and Call Options for the Common Stock of St. Joe Minerals Corp., and Banca Della Svizzera Italiana, Defendants.**

No. 81 Civ. 1836(MP).

United States District Court, S.D. New York.

June 3, 1986.

As Amended July 15, 1986.

Ira Lee Sorkin, Regional Administrator, S.E.C. by Anne C. Flannery, Robert B. Blackburn, Joseph G. Mari, Philip M. Giordano, Jennifer M. Russell, for plaintiff.

John F.X. Peloso, Daniel B. McIntyre, Sage Gray Todd & Sims, New York City, for defendant Giuseppe B. Tome.

Bruno Schachner, New York City, for defendants Transatlantic Financial Co., S.A., Nayarit Investments, S.A., Finvest Underwriters and Dealers Corp.

Chester J. Straub, David Trachtenberg, Willkie Farr & Gallagher, New York City, for defendant Banca Della Svizzera Italiana.

## FINDINGS AND OPINION

MILTON POLLACK, Senior District Judge:

### THE ACTION

This is a civil insider trading liability action, brought by the Securities and Exchange Commission ("SEC"), authorized by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d), seeking an injunction and other ancillary relief, including disgorgement of ill-gotten gains, against defendants based on defendants' violations of the antifraud provisions of the securities laws and regulations. Subject-matter jurisdiction is posited on Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa.

This action arises from the defendants' purchases of call options on the common stock of St. Joe Minerals Corporation ("St. Joe"), as well as of the stock itself, on March 10, 1981, the day immediately prior to the announcement by Joseph E. Seagram & Company of a hostile tender offer for all of the outstanding common stock of St. Joe. The issues were presented to the Court at a Bench trial.

The case reveals a crass abuse and betrayal of a personal and professional relationship of trust and confidence for personal gain. The principal defendant, Tome, exploited his confidential relationship with Seagram and with its Chairman of the Board and Chief Executive Officer, Edgar Bronfman, to obtain and misuse nonpublic information of Seagram's preparations to bid for control of St. Joe at $45 per share of common stock. Acting a day ahead of the announcement of that bid, on March 10, 1981, Tome positioned himself and his tippees to garner millions of dollars in unlawful gains by purchasing vast quantities of call options on St. Joe stock, and the stock itself, which was trading at about $30 per share, from unsuspecting sellers while Seagram was putting the finishing touches on the as-yet unannounced bid. Within days after the March 11th announcement of the hostile tender offer, which sent the St. Joe stock up to over $45 per share and skyrocketed the options accordingly, Tome and his tippees cashed in on their St. Joe call options and common stock. Tome fraudulently concealed his misappropriation of this confidential corporate information and his breach of the confidential relationship from Bronfman and from Seagram, falsely denying that he had made any St. Joe purchases and falsely denying any participation in the market when confronted and questioned specifically by Bronfman. As his identity in the illegal conduct came to

light through a prompt SEC investigation, Tome fled this country and has remained abroad since. His conduct, and that of his cohorts, was meticulously pieced together by the SEC, resulting in this suit.

## I. BACKGROUND

### A. *Identity and Interrelationship of Defendants*

Those involved in the misconduct complained of form an intricate international web which needs to be detailed in order to understand its ramifications.

#### 1. *Tome*

Giuseppe B. Tome ("Tome") is an Italian national who resides in Switzerland.[1] He first became involved in the securities industry in 1959 as a Registered Representative in the Milan, Italy office of Bache & Co. ("Bache"). Through the years, Tome was promoted within the Bache organization, eventually becoming Chairman of Bache & Co. (Overseas) S.A., located in Geneva, Switzerland. Tome left Bache in 1973 for a position as Vice President of E.F. Hutton & Company, Inc. ("Hutton"). At Hutton, Tome was involved with their international division, eventually managing several hundred registered representatives located in twenty-two offices worldwide.

When he resigned from Hutton on February 3, 1979, Tome was President of E.F. Hutton International, S.A., and was on the Board of Directors of Hutton.[2]

Sometime after leaving Hutton in 1979, Tome formed Compagnie Pour le Financement et l'Investissement, S.A. ("Finvest Geneva"), a securities firm headquartered in Geneva, Switzerland, of which he is the President and Chief Executive Officer. Finvest Geneva is controlled by, and is part of, a larger holding company, Infinvest Holdings, N.V., a Netherland Antilles corporation. *See infra* note 5.

In order to execute securities trades on the United States exchanges, Tome was also a registered representative from January 1980 until June 30, 1981, with Baird-Patrick & Co., Inc. ("Baird-Patrick"), a United States broker-dealer.[3] Tome forwarded, and sometimes himself initiated, orders to buy or sell securities traded on U.S. exchanges, primarily the New York Stock Exchange, for the accounts of his clients, or for companies affiliated with Finvest Geneva, to Baird-Patrick for execution.

Tome regularly visited the United States for periods of time for business and social reasons; in early April 1981, however, he left the United States abruptly,[4] missing a

---

**1.** Unless a contrary time period is indicated, all of the factual information stated in this Opinion, although expressed in the present tense, applies to the relevant time period involved here, the latter part of 1980 through April 1981. In addition, all hours, unless otherwise noted, refer to Eastern Standard Time.

**2.** According to a former colleague and former close friend of Tome, Alain Cheneviere, whom Tome hired while at Bache and took with him when he moved to Hutton, Tome left Hutton suddenly, under contentious circumstances. When Tome left he asked Cheneviere to "almost quit immediately" and follow him to some then, as yet, vague new venture; Cheneviere refused and became quite upset when Tome told him, Tome's confidante, "a gigantic lie." Cheneviere is presently a Vice President of Hutton in its Geneva office.

**3.** Apparently Tome was less than fully candid with Mr. Patrick, Chairman of Baird-Patrick, concerning Tome's activities other than those on

behalf of Baird-Patrick. Patrick did not know Tome was associated in any way with Finvest Geneva, except as the Baird-Patrick registered representative for that account. In addition, Patrick did not know that Tome, in fact, regularly executed option trades through A.G. Becker, another U.S. broker-dealer and a competitor of Baird-Patrick. Patrick did not consider it permissible, given Tome's relationship with Baird-Patrick, for Tome to put through option trades for his customers with A.G. Becker directly.

**4.** The SEC instituted this suit on March 27, 1981. At that time, however, the SEC did not know exactly who was responsible for the St. Joe trades. But the SEC did wish to speak to Tome since he was the registered representative on the St. Joe stock trades occurring through Baird-Patrick (approximately 3,000 shares). Although Tome was aware that the SEC wanted to talk with him, he did not volunteer to see them but in fact left the country before they were able to track him down.

scheduled business meeting on April 9, 1981. Tome was indicted in New York on *August 7, 1984,* charged with criminal violation of the securities laws. He has not been in the United States since 1981 and did not return to face the criminal charges. Although represented by counsel in this case, he refused to answer any interrogatories related to the transactions involved herein on the ground of the Fifth Amendment privilege against self-incrimination.

### 2. *Finvest Geneva*

Although not technically a defendant in this action, Finvest Geneva is discussed here next, both for purposes of clarity, and because of Tome's proprietary interest in and his use of Finvest Geneva in the matters involved herein.

Finvest Geneva belongs to a group of related enterprises (the "Finvest Group")[5] that, through Tome's design, were represented to potential clients as engaging in securities and commodities brokeraging, in trading and underwriting, Eurobond transactions, currency management, portfolio management, as well as in investment banking.

Finvest Geneva itself was founded by Tome in 1979; Tome is its majority shareholder and two banks, Banque Privee and Compagnie de Banque et D'Investissement ("CBI"), are minority shareholders. Finvest Geneva's clients comprise Swiss banks, persons with accounts in Swiss banks, and depositors of Swiss banks. Finvest Geneva managed portfolios for approximately 25–30 clients. Finvest Geneva was run from day to day by Tome, and when he was not there, by either of two other employees, Mr. Del Pozzo or Mr. Bulletti.[6]

Finvest Geneva had discretionary authority over at least some of its clients' accounts. The only persons exercising discretion over clients' accounts, however, were Tome and, to a lesser extent, Del Pozzo and Bulletti.[7] Thus, without the client's advance knowledge, Tome would often buy and sell stock and/or options for a particular clients' account.

### 3. *Lombardfin S.p.A.*

Lombardfin S.p.A.,[8] a holding company for various subsidiaries and affiliates, engaged primarily in securities and currency brokeraging, was formed in 1974 by Paolo Mario Leati ("Leati") and Dionisio G. Csopey ("Csopey"). Lombardfin S.p.A. and Finvest Geneva had a close working relationship because of Leati's relationship with Tome. In fact, Lombardfin S.p.A.'s two principal foreign affiliates were renting their *only* office space from Finvest Geneva.[9] Conversely, Tome often visited the Milan office of Lombardfin S.p.A.'s domestic subsidiary and used its facilities (*e.g.*, telephone, telex machine, quotation machine) to conduct his business. In addition, Lombardfin Securities Underwriters, a

---

5. Infinvest Holdings, N.V., a Netherland Antilles corporation, owns 100% of Finvest Securities and Commodity Brokers Corp., 100% of defendant Finvest Underwriters and Dealers Corp. ("Finvest Panama"), and 32% of International Corporation for Financing and Investment in Mexico Ltd. Finvest Geneva is also controlled by, and is a part of, Infinvest Holdings, N.V. The 1981 Second Quarter Report to Infinvest Holdings shareholders was signed by Tome.

6. Del Pozzo was Tome's assistant for prospecting and for the Mexican ventures. Bulletti coordinated the operating and administrative side of Finvest Geneva.

7. According to Lawrence B. Franko, Professor of International Business Relations at The Fletcher School, Tufts University, who formerly

was a consultant/employee of Finvest Geneva, "Mr. Tome essentially made the decisions [on currency management], and the people who executed the orders were executing his decisions."

8. In 1980–81, Lombardfin S.p.A.'s Board of Directors consisted of Riccardo Argenziano (chairman), Leati (vice-chairman), Mr. Spadacini, and Csopey. Its officers were Leati (general manager), Csopey (manager), and Mrs. Patricia Arbucias (secretary & manager).

9. In fact, according to Professor Franko, *see supra* note 7, Ms. Brax's "office" consisted merely of "an excess desk" and a telephone, with access to telex facilities. Thus, this Lombardfin-Finvest Geneva relationship consisted of much more interaction than that of a mere sublessor-sublessee relationship.

Lombardfin S.p.A. 100% owned affiliate, executed trades in the Eurobond market on Finvest Geneva's behalf because Finvest Geneva did not have the capacity to clear trades. Finvest Geneva had a securities trading account with Lombardfin Securities Underwriters, Ltd., which was opened on or about September 28, 1979.

### 4. *Leati and Csopey*

Leati is an Italian national residing in Italy. In 1974, he and Csopey left their employment at Merrill Lynch, Pierce, Fenner & Smith, and formed Lombardfin S.p.A., as a joint stock company. In 1980–81, Leati was the majority shareholder (60–75%) in Lombardfin S.p.A. Csopey (12.5%) and Fiduciaria di Investimenti, a company, were the minority shareholders. Csopey was not named as a defendant in this action.

Leati was the decision-maker for Lombardfin S.p.A. and its subsidiaries. He had discretion over accounts of many Lombardfin S.p.A. clients and thus could, and often did, trade shares and/or options for a client's account without that client's advance knowledge or specific approval.

### 5. *BSI*

Banca Della Svizzera Italiana ("BSI") is a Swiss banking institution with principal offices in Lugano, Switzerland. It maintains securities trading accounts for customers. It acted for Tome's interests and the accounts of the so-called Panamanian defendants, *i.e.*, NICO, TFCO, and Finvest Panama, discussed next.

### 6. *NICO*

To acquire the St. Joe securities he purchased directly on March 10, 1981, Tome used the brokerage trading accounts maintained at BSI for three Panamanian entities in which Tome had a beneficial interest, namely NICO, TFCO, and Finvest Panama.

The first of these BSI accounts, Nayarit Investments, S.A. ("NICO"), is a Panamanian company which was formed on or about May 31, 1978. NICO's principal line of business is the management and administration of assets deposited in bank accounts. Tome provided NICO with investment advisory and management services, for which no fees were paid to Tome. Tome was a beneficial owner of and held discretionary authority and a power of attorney over the NICO account.

### 7. *TFCO*

The second of these trading accounts at BSI, Trasatlantic Financial Co., S.A. ("TFCO"), is a Panamanian company which was formed on or about March 25, 1980. TFCO's principal line of business is the management and administration of assets deposited in bank accounts. Here again, Tome provided TFCO with investment and advisory services, without fee. Tome was a beneficial owner of the TFCO account and held discretionary power over it.[10]

### 8. *Finvest Panama*

The third of the trading accounts at BSI, Finvest Underwriters and Dealers Corp. ("Finvest Panama"), is a Panamanian corporation that was formed on or about June 26, 1979. Tome has been a beneficial owner of the Finvest Panama account with BSI and has had discretionary power over it. *See supra* note 10.

As noted previously, *see supra* note 5, Finvest Panama is a wholly owned subsidiary of Infinvest Holdings, N.V. (*i.e.*, the Finvest Group), and thus is directly related to Finvest Geneva, and thus to Tome.

### B. *The Confidential Relationship*

At the base of this suit, we find a personal acquaintance that flowered and bloomed into an intimate friendship and a professional association in which trust and confi-

---

**10.** On March 15, 1981, after purchasing the St. Joe stock and options that form the subject of this action, Tome called Claudio Nesa, assistant manager of defendant BSI, and asked him to reallocate the option purchases from Finvest Panama to NICO and TFCO. Tome stated that the reason he was doing this was "to secure greater confidentiality within *his organization*." (emphasis added).

dence were reposed in Tome, of which he callously took shoddy and unlawful advantage.

Edgar M. Bronfman ("Bronfman") is the Chairman of the Board and Chief Executive Officer of Joseph E. Seagram & Co. ("Seagram"), an Indiana corporation, and of its parent corporation, Seagram Company Ltd., a Canadian corporation.

Bronfman met Tome in July 1980 when they flew together, as part of a group of fourteen people, on the Seagram Company airplane to Cheyenne, Wyoming to attend a rodeo. Bronfman's wife had met Tome and his wife earlier that month. The Tomes promptly ingratiated themselves, resulting in an invitation to accompany the Bronfmans on the trip to help Mrs. Bronfman celebrate her birthday.

Using his opportunity on the airplane, Tome turned to financial matters and discussed currencies with Bronfman. Using a reprint of an article written about him that he happened to have handy, Tome showed Bronfman his oft-repeated "insight" that any American corporation keeping all its accounts in U.S. dollars is thereby "going short" on other currencies.

Within weeks of this enticing initial discussion, Bronfman introduced Tome to Harold Fieldsteel, Seagram's chief financial officer. In a memorandum to Fieldsteel, dated August 5, 1980, immediately prior to a meeting between Tome and Seagram's officers on the topic of Seagram's currency position, Bronfman stated that Tome's "record warrants our taking a serious look at his firm's [*i.e.*, Finvest Geneva's] capabilities," and that Bronfman was "not at all interested in any defensive attitude on [Seagram's] part."

After the initial associations, Tome moved in on the Bronfmans and intensified the social relationship and his business approach.

In October 1980, through Tome's efforts, Finvest Geneva obtained as a major client Seagram with which it signed two agreements. On October 2, 1980, Tome, acting for Finvest Geneva, signed a "Foreign Exchange Advisory Agreement" with Seagram under which, in exchange for $100,000 annually (later reduced to $50,000), Finvest Geneva agreed to provide Seagram with information and advice regarding world currencies and to form for it a foreign exchange advisory committee, the members of which were to be selected by Finvest Geneva with Seagram's approval. On October 8, 1980, Tome, acting for Finvest Geneva, entered into an "Investment Management Agreement" with Seagram under which Finvest Geneva was given discretion to invest ten million dollars of Seagram's money in various currencies, bonds and notes, and to exchange it from one currency to another. As a management fee, Finvest Geneva would receive one-eighth of 1%, per quarter, of the average amount of funds held in the Seagram account.

Although not memorialized as a "formal" relationship, but clearly indicated by subsequent conduct, Bronfman, in his own words, "consider[ed Tome] sort of a European consultant to Seagram generally." It was in the context of the actual relationship that Bronfman conveyed to Tome a stream of material non-public information concerning Seagram's acquisition plans. Tome seized and actively solicited and nurtured this confidentiality, frequently probing into the internal reasons for Seagram's actions, asking Bronfman "why?" Bronfman, on the other hand, states that he sought Tome's insight into "how the European investment community would look at Seagram if [it] made such an acquisition." Unquestionably, Tome was Bronfman's friend and advisor, had formal contractual relationships with Seagram, through Finvest Geneva, and had vast experience in the securities industry;[11] clear-

---

11. Apparently, Tome was not as open with his other associates, to whom he only selectively revealed his activities and experience and only when it behooved him to do so. For example,

although Bronfman knew that Tome was the principal officer of Finvest Geneva and knew that he was affiliated with the U.S. securities firm of Baird-Patrick, the head of Baird-Patrick,

ly, Tome was looked upon and treated by Bronfman as an insider of Seagram, as he had become.

In his personal finances as well, Bronfman trusted and confided in Tome. Bronfman opened a personal account with Finvest Geneva for trading in commodity futures and currencies; he gave Tome a power of attorney and discretion over his personal account. Bronfman consulted with Tome "as an advisor [for] general business purposes." This advisory function led to a "joint venture" between Bronfman and Tome, on behalf of NICO, as investors in the Broadway musical "Sophisticated Ladies." In fact, Bronfman even replaced with his own money a $5,000 bounced check that Tome issued to the "Sophisticated Ladies" partnership on behalf of NICO. On another occasion, Tome suggested a "joint venture" to Bronfman whereby they would buy a block of stock in the Bache securities firm.

Underlying and encouraging these confidential and business relationships, both Seagram-related and personal, between Bronfman and Tome were a pervasive series of social contacts. After initially meeting Tome on the plane trip for Bronfman's wife's birthday, Bronfman saw Tome regularly, approximately a dozen times, until April 1981 and exchanged telephone calls from time to time.

Given the brief period of time they had known each other, Bronfman's and Tome's close social contacts were extensive and significant, giving Tome the access to Bronfman and thus to Seagram that he promoted. In November 1980, Bronfman, his wife, and another couple spent a weekend with Tome in Mageve, France at Tome's ski lodge. On that same trip, Bronfman and his wife were personal guests at Tome's house in Geneva, Switz-

erland, at a dinner party. In December 1980, Tome visited Bronfman and his wife during hunting season at their home in Charlottesville, Virginia. Bronfman and his wife spent the Christmas and New Year's holidays in 1980–81 with Tome and his wife on a boat off Mexico.

### C. *Seagram's Acquisition Plans*

In August 1980, just after Bronfman met Tome, Seagram sold its interest in Texas Pacific Oil Company for $2.3 billion dollars. With this tremendous cash reserve, Seagram began looking at companies for purposes of finding an acquisition candidate. Seagram set up an acquisition committee, lined up a $3 billion dollar line of credit (that was available after November 1980),[12] and hired Arthur D. Little & Company to do a macro study of how the world would change in the next twenty to thirty years, and thus where the best business opportunities lay. Bronfman was "fascinated" with coal as the primary source of energy after oil in the next 20–30 years and began to look at companies that had coal assets, particularly Santa Fe, Amax, St. Joe, and Union Pacific.[13]

In late 1980, Tome requested that Seagram provide him with a general briefing on its policies, operations, and financials, and he informed Seagram's officers that he was interested in discussing with them Seagram's use of the proceeds it had obtained from the Texas Pacific Oil sale. The data was provided to him, and Bronfman spoke with Tome as a consultant to Seagram about its acquisition and hostile tender offer plans.

Sometime during the Fall of 1980, Seagram considered purchasing up to twenty percent of the outstanding shares of Texa-

---

the one who hired Tome, did not even know that Tome had any relationship with Finvest Geneva except as Baird-Patrick's registered agent for its Finvest Geneva account.

**12.** Tome knew of this line of credit before it was generally reported to the public. By letter dated November 25, 1980, Tome indicated his awareness of Seagram's preparation for a "jumbo"

borrowing of money. That Seagram was making preparation for a large borrowing was reported in the *Wall Street Journal* on December 12, 1980.

**13.** Union Pacific, though, was almost immediately ruled out by Bronfman because "it's just a little too large to even contemplate [acquiring]."

co.[14] Bronfman testified that Seagram "proceeded and got pretty close to actually making a tender" for Texaco. Around December 10, 1980, Bronfman decided that Seagram would not proceed with the Texaco tender.[15]

Immediately after deciding not to proceed with the Texaco stock purchase, Bronfman (and his investment bankers and acquisition committee) "started to focus on Santa Fe Industries." In mid-December, while Tome visited Bronfman at his house in Charlottesville, Virginia during hunting season, Bronfman discussed Seagram's acquisition plans with Tome in an attempt to determine "how the European investment community would look at Seagram if [it] made such an acquisition":

> And he [Tome] asked, you know, had we gotten any closer to making any decision as to what we [Seagram] were going to do [about an acquisition] and I [Bronfman] said, yes I think we are looking very hard at Santa Fe. And we discussed it in general. *He wanted to know why.* I told him about the kind of asset play that it represented. (emphasis added).

Tome probed further, asking Bronfman *"when* do you think?" (emphasis added). Bronfman told him that it might take another couple of months, and that the investment banking firms of Goldman, Sachs, and Lazard Freres were advising Seagram on the matter.

Tome and Bronfman "didn't just discuss Santa Fe, but companies like Santa Fe." [16] The coal resource companies that Bronfman had on his short list at the time were Santa Fe, Amax, and St. Joe.[17]

During this mid-December conversation, Bronfman did not consider it necessary to caution Tome that the information Bronfman was giving him was confidential because:

> I [Bronfman] didn't think it was necessary.... [because of Tome's] 20 years in this business. He ought to know the rules. I assume he does know the rules.... [The rules are] [t]hat basically [what I told him] was inside information[;] ... [y]es[, materially non-public information].

At a Board meeting of Seagram's parent corporation, held by telephone conference call on January 13, 1981, the Board authorized Seagram to invest up to $150 million dollars in four companies, *the identities of which were not revealed even to the Board members at that time,*[18] in connection with Seagram's possible interest in a candidate for acquisition. Seagram then immediately began purchasing fifteen million dollars worth of stock in each of the following companies: Santa Fe, Amax, St. Joe, and Kimberly Clark.[19]

14. Promptly Texaco became the most heavily traded stock by Finvest Geneva in November and December 1980, according to Mr. Andrea Manzoni, former employee of Finvest Geneva who placed orders for securities purchases as either Tome, Del Pozzo, or Bulletti instructed him.

15. Finvest Geneva began selling Texaco stock and options beginning December, really developing around December 11, through the next several months, according to Mr. Federico Pignatelli, former employee of Finvest Geneva who placed orders for securities as he was instructed by either Tome, Del Pozzo, or Bulletti.

16. Finvest Geneva began buying Santa Fe stock heavily in late December 1980 and early January 1981, according to Manzoni. Except perhaps for Texaco, Santa Fe was the most heavily traded stock at Finvest Geneva during this time period.

17. After this mid-December conversation with Tome, according to Bronfman, during this period "it's possible that [Bronfman] could have mentioned the entire field [of potential acquisition candidates] that we [Seagram] were discussing with basically [the investment banking firm of] Lazard Freres."

18. But, of course, Tome already had been told of the identities of these four companies as ones that Seagram was considering as a potential target and buying into at the rate of $15 million apiece.

   The identities of these four companies were revealed to the Board at its next regularly scheduled meeting, February 4, 1981.

19. Kimberly Clark was suggested by Bronfman's brother, who apparently was alone in his interest in that company. Bronfman never seriously considered Kimberly Clark as a takeover candidate.

On January 28, 1981, Seagram determined that it would not proceed with the potential acquisition of Santa Fe.[20] Bronfman conveyed this information to Tome by February 6 at the latest. That decision precipitated a sale of Santa Fe stock and options by Finvest Geneva.[21]

The decision not to pursue Santa Fe left only Amax and St. Joe as Seagram's potential takeover candidates. Tome was told of this whittling down of Seagram's possible targets.

Shortly thereafter, in early February, Amax was dropped by Seagram as a potential acquisition candidate. At a lunch that took place sometime on or before February 6, 1981, a partner of Lazard Freres, on behalf of Seagram, approached the Chairman of Standard Oil of California ("SoCal"), which owned 20% of Amax's stock, to ask if SoCal would be willing to sell its interest in Amax. After the Chairman of SoCal told him no, Seagram abandoned any idea of making an acquisition of Amax.

According to Bronfman, *"[a]lmost by a process of elimination, that left St. Joe."* (emphasis added). Bronfman disclaimed a "clear" recollection of whether he told Tome of Seagram's discontinued interest in Amax: "I'm sorry, it's fuzzy."[22] Of the four possible targets in which Seagram had made an initial and token investment of fifteen million dollars, only St. Joe remained as a potential acquisition candidate for Seagram.

Bronfman asked Lazard Freres to find out as much information as possible about St. Joe and to come up with an evaluation. By February 25, 1981, Bronfman had decided that Seagram would go ahead with a tender offer for the acquisition of St. Joe.

One small diversion developed, but only momentarily. At the suggestion of an investment banker, to canvass the possibility of a "joint venture" arrangement with Santa Fe, Bronfman met for lunch on February 26 in Chicago with the Chairman and Chief Executive Officer of Santa Fe, John Reed. That meeting, however, was unsuccessful.

Seagram tried to keep its interest in St. Joe secret from the marketplace. The market activity in St. Joe securities from January through early March 1981 indicates that Seagram's efforts were largely successful; the value and price for St. Joe securities remained relatively flat. Indeed, Salomon Brothers & Co., a highly knowledgeable New York broker-dealer, executed sales of a vast block of up to one million St. Joe shares on behalf of an institutional client during the two weeks prior to, and including, March 9, 1981, when the price range was $25 to $30 per share. Had there been any indication abroad that a hostile tender bid to take over St. Joe was expected by the market, Salomon Brothers surely would have advised their client to hold, rather than sell, such a large position.

For several months prior to early March, the average daily volume of trading in St. Joe options on the Philadelphia Exchange had been only about 254 options. By Thursday, March 5, 1981, there was no trading in the March 1981 options of St. Joe which were due to expire that month. The average daily volume of trading in St. Joe common stock on the New York Stock Exchange was approximately 50,000 shares.

---

**20.** Finvest Geneva was selling Santa Fe stock and options from late January through mid-February 1981, according to Pignatelli.

**21.** Although Bronfman remembers telling Tome of Seagram's discontinued interest in Santa Fe ("the next time I saw him [Tome], I probably, you know, probably told him we [Seagram] were not going to do the Santa Fe deal."), he is unclear of exactly when that was. It was at least "within the next two weeks ..."

It must have been by February 6, at the latest, however, since Bronfman does not remember speaking to Tome from February 6 through March 9, 1981.

**22.** Even if Tome did not hear of Seagram's discontinued interest in Amax from Bronfman, SoCal's (which already owned 20% of Amax) tender offer for Amax on March 6, 1981 would have informed Tome that Amax was no longer a viable target for Seagram. Thus, in any event, at least several days before Tome purchased St. Joe securities on March 10, he knew that St. Joe was Seagram's only viable, remaining takeover candidate.

None of this was indicative to any market follower of an impending hostile tender offer.

### D. *March 9, 1981 And Following*

On March 9, Bronfman was in Hilton Head, South Carolina. He was scheduled to leave there by private jet at 3:00 p.m. He accelerated his departure, however, and instead left Hilton Head at 1:00 p.m. to attend a meeting specially called for later in the afternoon in New York, at 5:30 p.m., with several Seagram executives, its investment bankers, and outside counsel to discuss a St. Joe tender. His bankers were concerned with insuring secrecy of the tender plans afoot by taking early action.

Upon his return to his office in New York, before the 5:30 p.m. meeting, Bronfman received a telephone call from Tome who was also in New York (since Sunday, March 8) at the time. The reason given by Tome for the telephone call was to invite Bronfman to dinner for the following evening, March 10.

Bronfman declined Tome's dinner invitation on the grounds that he "was going to be in Montreal for a directors' meeting." According to Bronfman, *Tome then asked Bronfman,* "[a]re you having a [Seagram] Board meeting in Montreal?"

Armed with his prior knowledge that St. Joe was Seagram's only remaining, viable takeover possibility and with the information he had just obtained from Bronfman in their March 9 phone conversation indicating, from the background of a search for a target, that some official action on corporate matters was imminent, and that Bronfman was on his way to a Board meeting, all signals of important business at hand, Tome decided to concentrate in one day frenzied buying of an enormous quantity of call options on St. Joe stock and of the stock itself; he also tipped others to do likewise. The circumstances were such that Tome reasonably inferred that a vote on a tender proposal was imminent. Tome's immediate conduct confirmed that he was not merely speculating on what was afoot; the extraordinary scope of his financial activities on the next morning was beyond any notion of rational, normal trading. The facts and circumstances lead to the ineluctable inference, which the Court draws, that Tome had obtained material non-public information in confidence from Seagram that it intended to make a tender offer for St. Joe.

Beginning 8:55 a.m. on March 10, Tome, from New York, feverishly placed overseas orders for St. Joe call options to be executed on the Philadelphia Exchange for the accounts of NICO, TFCO, and Finvest Panama. In addition, by 12:35 p.m., Tome had urged others, *i.e.,* clients and business associates, through overseas calls to Europe on at least fourteen separate occasions, to purchase St. Joe securities on American Exchanges.

Before the market opened on March 10, Tome called BSI three times, at 9:13 a.m., 9:26 a.m., and 9:51 a.m., speaking for 4 minutes, 11 minutes, and 3 minutes respectively. He placed the following orders for options [23] to purchase St. Joe stock on behalf of NICO, TFCO, and Finvest Panama through their trading accounts at BSI, spurring on the BSI broker "to rapidly pass the order":

| Account | Quantity | Series | Limit Per Underlying St. Joe Share [24] |
|---------|----------|--------|------------------------------------------|
| NICO | 50 | March $25 | $3.00 |
| | 200 | March $30 | .75 |
| | 50 | June $25 | 5.00 |
| | 50 | June $30 | 2.50 |

**23.** Each option gives the purchaser the right to purchase 100 shares of stock on terms provided by the option "series" purchased. The "series" indicates the time at which the option expires and the price at which it is exercisable. So, in this context, purchase of 50 March $25 options gives the purchaser the option through March 1981 to buy 5,000 St. Joe shares at $25 per share.

**24.** This "limit per underlying share" is the maximum price Tome was willing to pay for the option. Since one option represents the right to purchase 100 shares at a future date for a fixed price, a limit of $3.00 per underlying share would result in a maximum price to buy the one option of 100 shares x $3.00, or $300.

| Account | Quantity | Series | | Limit Per Underlying St. Joe Share [24] |
|---------|----------|--------|--|------------------------------------|
| TFCO | 50 | March | $25 | $3.00 |
| | 200 | March | $30 | .75 |
| | 50 | June | $25 | 5.00 |
| | 50 | June | $30 | 2.50 |
| Finvest | | | | |
| Panama | 100 | March | $25 | 3.00 |
| | 400 | March | $30 | .75 |
| | 100 | June | $25 | 5.00 |
| | 100 | June | $30 | 2.50 |

Tome called BSI three additional times that day, at 11:07 a.m., 11:51 a.m., and 12:32 p.m., speaking for 6 minutes, 1 minute, and 1 minute respectively. During these calls, approximately two hours after his initial calls to BSI, as the market price began to strengthen from the impact of a buying spree, Tome authorized an increase in the limits on the options previously ordered:

| Series | | Original Limit | New Limit |
|--------|--|----------------|-----------|
| March | $25 | $3.00 | $5.00 |
| March | $30 | .75 | 2.00 |
| June | $25 | 5.00 | 7.00 |
| June | $30 | 2.50 | 4.00 |

At the same time, Tome furnished BSI with a ¼ point discretion and reduced the order for March $30 call options from 800, total, to 400 contracts.

On March 10, through its account at A.G. Becker, a U.S. securities brokerage company, BSI made the following St. Joe option purchases as a result of Tome's order:

| Total Quantity (NICO, TFCO and Finvest Panama) | Series | | Average Option Price Per Underlying St. Joe Share |
|-----------------------------------------------|--------|--|--------------------------------------------------|
| 200 | March | $25 | $5.25 |
| 455 [25] | March | $30 | 2.15 |
| 200 | June | $25 | 7.23 |
| 200 | June | $30 | 4.22 |

These 1,055 options gave the purchaser the right to purchase a total of 105,500 shares

of St. Joe common stock for prices of either $25 or $30 per share, depending on the series purchased.

Also on March 10, Tome called Finvest Geneva twice, at 10:30 a.m. and at 10:54 a.m., speaking for 8 and 12 minutes respectively. On March 10, a Finvest Geneva representative, undoubtedly at Tome's direction, placed an order through Baird-Patrick to buy 3,000 St. Joe shares of common stock on the New York Stock Exchange for Finvest Panama's account at BSI. That order was executed at $30 per share and delivery was made to BSI against payment from BSI's account at Irving Trust Company.[26]

Two thousand of the three thousand St. Joe shares of stock purchased for the account of Finvest Panama on March 10 were sold for approximately $94,000, netting an overnight profit of approximately $34,000. The remaining one thousand St. Joe shares subsequently were exchanged for 1,200 shares of Fluor Corp. The proceeds of the sale and the 1,200 shares are frozen in BSI's account at Irving.

In addition to Tome's direct purchases, his telephone calls caused and resulted in tippee transactions on a grand scale. At 8:55 a.m. on March 10, Tome called his client Banque du Rhone, a Swiss bank in Geneva, Switzerland, speaking for 17 minutes. About three hours later, at 11:58 a.m., Banque du Rhone purchased 200 St. Joe shares and 50 St. Joe call options, at a total cost of $16,750. The subsequent sale of these securities resulted in proceeds of $114,756, with a net profit of $98,006.

At 10:17 a.m. on March 10, Tome called Leati of Lombardfin S.p.A. in Milan, Italy, speaking for 5 minutes.[27] Leati admits that in this telephone call Tome told Leati "I'd buy [St. Joe]." In view of the interrelationships, that expression was the equivalent of a virtual direction.

---

**25.** Although Tome had reduced the options ordered in this series from 800 to 400, BSI actually obtained executions on 455. Tome accepted the extra 55 options BSI obtained.

**26.** This purchase was confirmed by telex to BSI from Finvest Geneva on March 11, 1981.

**27.** Tome also called Lombardfin at 12:35 p.m. on March 10, speaking for 4 minutes.

*Two minutes* after hanging up on Tome's phone message, at 10:24 a.m., Leati, without first consulting his clients, began buying St. Joe securities on behalf of Lombardfin clients through their Lombardfin accounts. Before this first trade, Lombardfin S.p.A. had never traded even one single share of St. Joe securities. By the end of the day, however, Leati had purchased more than 40,000 shares for the following accounts and the positions were shortly thereafter liquidated with the profit results indicated:

| Account Name | First Trade | Quantity [28] | Cost | Liquidation Proceeds |
|---|---|---|---|---|
| Credit Suisse Lausanne | 10:24 a.m. | 10,000 S | $294,375 | $481,250 |
| Osiris Ltd. | 10:26 a.m. | 500 O | 168,237 | 835,062 |
| Credito Svizzero Chiasso | 11:45 a.m. | 8,000 S | 240,437 | 360,500 |
| Unione di Bache Svizzere | 1:00 p.m. | 3,000 S | 91,875 | 137,375 |
| Banque Pictet | 2:23 p.m. | 3,000 S | 90,375 | 138,375 |
| Banque Privee | 3:34 p.m. | 5,000 S | 150,625 | 235,812 |
| Credito Svizzera Lugano | 3:59 p.m. | 9,200 S | 276,850 | 437,200 |
| Lombardfin Securities | No Time Stamp | 2,000 S | 60,750 | 93,875 |
| TOTALS | | 40,200 S & 500 O | $1,373,524 | $2,719,449 |

Deducting total cost from total proceeds, these transactions resulted in a profit of $1,345,925 for these accounts.

At 10:24 a.m. on March 10, about two minutes after getting off the phone with Leati at Lombardfin, Tome called Cramer, a Swiss bank in Geneva, Switzerland, and a Tome client, speaking for 5 minutes. *Twelve minutes* later, at 10:41 a.m., Cramer began buying St. Joe securities. It purchased 100 St. Joe call options and 1,000 St. Joe shares, at a total cost of $50,012. The subsequent sale of these securities shortly thereafter resulted in proceeds of $183,500, with a net profit of $133,488.

At 11:15 a.m. on March 10, Tome called Compagnie de Banque et d'Investissements ("CBI"), a Swiss bank in Geneva, Switzerland, a Tome client, and a partner in Tome's Finvest organization, speaking for 1 minute. Less than two hours later, at 1:00 p.m., CBI ordered 150 St. Joe call options and 1,100 St. Joe shares, at a total cost of $64,837. The subsequent sale of these securities shortly after the purchases resulted in proceeds of $234,000, with a net profit of $169,000.

As noted previously, on March 10, Tome called Finvest Geneva twice, once at 10:30 a.m., speaking for 8 minutes, and once at 10:54 a.m., speaking for 12 minutes. Shortly after each of these calls, two of Tome's clients, Banque Gutzwiller ("Gutzwiller") and Trade Development Bank ("TDB") began buying St. Joe securities.

At 10:40 a.m. on March 10, Gutzwiller ordered 2,000 St. Joe shares, at a total cost of $59,250. The subsequent sale of these securities resulted in proceeds of $90,737, with a net profit of $31,487.

At 12:02 p.m. on March 10, TDB ordered 13,000 St. Joe shares, at a total cost of

**28.** The letter "S" designates St. Joe shares, and the letter "O" designates St. Joe call options.

$390,750. At 6:39 a.m. on March 11, Tome called TDB, speaking for 10 minutes. Subsequently, beginning at 2:55 p.m. on March 11, TDB sold its St. Joe shares for proceeds of $597,675, with a net profit of $206,925.

What method Tome used to convey his inside information to Gutwiller and to TDB cannot be stated with certainty. Under the circumstances and facts of this case, however, it is reasonably inferrable that Tome did convey his inside information to them. These two banks were clients that Tome brought over to Baird-Patrick, with Tome listed as representative for the accounts. Both banks began trading in St. Joe securities at exactly the same time as the banks Tome had called directly. Both banks began trading very shortly after Tome's calls to Finvest Geneva. Gutzwiller placed its order two minutes after Tome had completed his first call to Finvest Geneva; TDB placed its order less than one half hour after Tome completed his second call to Finvest Geneva. The evidence shows that Tome called many of his other clients directly on March 10 to tell them to buy St. Joe securities. Tome called TDB directly at 6:39 a.m. on March 11, just hours before the Seagram tender offer was publicly announced. Unquestionably, Tome was in direct contact with at least TDB during this crucial interval.

■ Despite the uncertainty over *how* the inside information was conveyed by Tome to Gutzwiller and to TDB, it is reasonably inferrable that it *was* conveyed. Moreover, this uncertainty over *how* is largely due to Tome's refusal to testify in this action, by invoking his Fifth Amendment privilege against self-incrimination. While Tome has a right to remain silent and thereby to not inculpate himself and to avoid confrontation therewith in the criminal action, he is not entitled to profit by his silence in this civil action. Therefore, to the extent necessary, this Court is justified in drawing an adverse inference from Tome's assertion of his Fifth Amendment privilege in this civil action.[29] This Court finds that Tome conveyed the inside information that he possessed to Gutzwiller and to TDB, and that they subsequently traded and profited personally on that information. Consequently, Tome is liable to account for their profits obtained from these transactions.

When aggregated, the activities of Tome, as recited above, directly and indirectly, accounted for a significant portion of the volume of St. Joe option transactions executed on the Philadelphia Exchange on March 10:

| Series | Total St. Joe Calls Purchased On March 10 | Total St. Joe Calls Purchased By Defendants March 10 | Percentage of Total Calls On St. Joe Represented By Defendants' Purchases |
|---|---|---|---|
| March $25 | 285 | 200 | 70% |
| March $30 | 2334 | 705 | 30% |
| June $25 | 1334 | 200 | 15% |
| June $30 | 740 | 350 | 74% |
| June $35 | 463 | 50 | 11% |
| TOTALS | 5,626 | 1,855 | 33% |

29. For a discussion of the legal justification for drawing an adverse inference from Tome's assertion of his Fifth Amendment privilege in this civil action, *see* the separate memorandum on evidentiary issues raised in this case.

In addition to options on 185,500 shares of St. Joe common stock, Tome and his satellite purchasers accounted for the purchase of at least 60,500 St. Joe shares, 10.67% of the total volume in St. Joe stock on the New York Stock Exchange on March 10.

On March 10, 1981, at 7:00 p.m., an unscheduled special meeting of the Seagram parent company Board of Directors was held in Montreal, Canada. This special meeting was called on short telephone notice according to the Board minutes. Bronfman, in common with the other directors, unaware of Tome's feverish trading activity earlier in the day, attended this special meeting.

Bronfman's deposition testimony was content to characterize this special meeting on March 10 as merely an "acceleration" of the "regularly scheduled" Board meeting, which was accelerated from March 11 in response to suggestions of the investment bankers concerned with maintaining confidentiality of the ongoing preparation of the tender offer to be voted on by the directors as well as probably dismayed at the market activity in the St. Joe stock on March 10. Bronfman's uncertain recollection was that the *decision* to accelerate was made at lunch on March 10, but there was no luncheon—if the recollection were true, thirteen of the fifteen Seagram parent company Directors, including eight of the ten outside Directors, and the substantial coterie of investment bankers, consultants, engineers, and lawyers who showed up at the meeting, came to Montreal a day earlier than the fixed meeting date on *at most* six or seven hours notice before the meeting began. There was no testimony that pinpointed when he *first considered* accelerating the meeting, *i.e.*, whether accelerating the Board meeting was considered before or after he spoke to Tome on March 9 and turned down a dinner engagement for the evening of the special meeting.

On March 10, 1981, the parent company authorized Seagram to make its tender offer for the shares of St. Joe.

The defendants presented a witness with a view to explaining the extraordinary 50% surge of the market price on March 10th 1981. Mr. Marc Cohen, an analyst in mining industries for the brokerage firm of Kidder, Peabody held to the dubious belief that events over many prior months caused the explosion. When questioned about what material non-public information might catalyze what occurred, he conceded that an awareness that a special meeting of the Seagram Board was about to take place would have been material, non-public information in light of the contemporaneous facts and circumstances and inferentially might account for what had happened.

On March 11, before Seagram's announcement of the St. Joe tender offer, Tome called BSI twice, at 6:23 a.m. and 6:25 a.m., speaking for 1 and 2 minutes respectively. At 8:00 a.m., BSI called Tome back. During this conversation, Tome instructed BSI to place an order for an additional 2,055 St. Joe call options *without price limit at the market.* While BSI was attempting to place this order, Tome anxiously stayed on an open telephone line to BSI for confirmation. BSI informed Tome that 2,000 call options was the floor trading limit on the Exchange. Tome then reduced his call option purchase order to 945 call options.

Again that morning, before the Seagram tender offer for St. Joe was publicly announced, Tome again placed overseas calls to two European clients. At 6:04 a.m. he called CBI, speaking for 1 minute. At 6:39 a.m. Tome called TDB, speaking for 10 minutes.

At 9:22 a.m. on March 11, the Seagram tender offer for St. Joe was publicly announced. The announcement resulted in a delay in the opening of trading for St. Joe securities. In consequence, the large call option orders Tome placed on the morning of March 11 were never executed on the Exchange.

At 10:30 a.m. on March 11, a so-called "regularly scheduled" Board meeting of the Seagram parent company was held in Montreal pursuant to a notice of meeting that had been forwarded to all Directors on February 23, 1981.

After the meeting on March 11, Bronfman returned to New York from Montreal. Through arrangement prior to March 9, 1981, between their wives, Bronfman and Tome met and went in the evening of March 11th to see the play they had invested in, "Sophisticated Ladies."

That evening, Bronfman discussed Seagram's tender offer for St. Joe with Tome. Bronfman discussed his telephone conversation with the St. Joe management, whom he had called just prior to Seagram's public announcement of the St. Joe tender to advise them of the impending offer. Bronfman discussed with Tome the price Seagram had tendered and speculated to Tome on Seagram's chance of success. In addition, Bronfman disclosed the timetable for the St. Joe tender and the behind-the-scenes arrangements for Board meeting schedule changes.

Despite Bronfman's confidences and discussions with Tome on the topic of the St. Joe tender offer that evening, Tome was eloquently silent and mentioned absolutely nothing to Bronfman about Tome's massive orders, trades, telephone calls overseas, and exhortations to others in regard to St. Joe securities.

Beginning on March 12, 1981, Tome instructed BSI immediately to liquidate and cash in the St. Joe option positions acquired on March 10. Specifically, at about 8:24 a.m., Tome called BSI, speaking for 9 minutes, and instructed it to sell all March options he had purchased for the accounts of NICO, TFCO, and Finvest Panama. At 8:43 a.m., Tome called Banque du Rhone, speaking for 6 minutes. Shortly thereafter, Banque du Rhone cashed in its purchases.

On March 12, Bronfman gave a dinner party in Tome's honor for twenty people at Bronfman's house. Once again, Bronfman talked to Tome about the Seagram tender offer for St. Joe. Again, Tome maintained total secrecy and made no mention to Bronfman about his activities in St. Joe securities in the prior two days.

On March 13, at 8:47 a.m., Tome called BSI, speaking for 11 minutes, and instruct-ed it to sell the 50 June $25 options and 50 June $30 options he had acquired on March 10. On that same day, news of the SEC inquiry into possible insider trading on the Seagram bid for St. Joe was publicly disseminated.

Tome decided it was time to leave New York. Although he had reservations through March 18 at his hotel in New York, Tome cut short his visit to the United States and returned on March 14 to Switzerland.

On March 15, 1981, Tome, in Geneva, called BSI and requested that they rearrange the option purchases to make it appear that Finvest Panama had not purchased any of the St. Joe options. He suggested that Finvest Panama's purchases of March options be reallocated to NICO and of June options be reallocated to TFCO. The ostensible reason for this falsification and switch was to "secure greater confidentiality within his organization." After a series of meetings, BSI vehemently declined to change its records of the transactions as they were effected. BSI reported to Tome that its account entries were "unalterable" and Tome's requests to change the records were rejected.

The SEC filed this suit on March 27, 1981. The SEC initially had difficulty in identifying so shortly after the trading activity the foreign nationals who made the trades, and the defendants were initially identified by category, not by name. As it became clear exactly who had engineered the St. Joe trades, their names were added by amendment to the title of the lawsuit.

BSI, the Swiss bank, and Irving Trust Company of New York, were the only defendants named in this suit on March 27, 1981. Proceeds of the illegal trading, as later described herein, were in the possession of Irving Trust, and under the control of BSI. The accounts for which trades were made through the Lugano branch of BSI were identified only as those of "Unknown Purchasers."

As a result of the liquidation of the options transactions through BSI, approxi-

mately $1,825,000 (less commissions) was credited to BSI's account at Irving Trust Company, at the direction and on behalf of Tome, NICO, TFCO, and Finvest Panama. Of this sum, approximately $1,442,000 represented profit.

Despite the fact that Tome's name had not been mentioned in any public documents as being implicated in insider trading, on Monday, March 30, 1981, after hearing of this suit, Bronfman immediately telephoned Tome. Bronfman called Tome because he was concerned that:

> perhaps he [Tome] had done something. I wanted to make doubly sure he hadn't. Because the only person I knew in Switzerland that would have any knowledge one way or another of anything that was going on, at least for me, was Mr. Tome.

Bronfman was unable to reach Tome.

From Zurich, Switzerland, Tome returned the call by telephoning Bronfman at his apartment that same night at approximately 7:20 p.m. Tome said that he was sorry that Bronfman had called him earlier. He then told Bronfman the first of several boldfaced lies:

> You know, I've been in this business [i.e., securities] for 20 years and I know what to do and what not to do. And clearly I certainly didn't do anything.... But, it's a little more complicated than that and I will see you in New York next week.

A week later, on Monday, April 6, at approximately 5:30 p.m., Tome dropped by Bronfman's apartment in New York unexpectedly. Tome lied again and told Bronfman that, in his absence from Geneva, "one of his [Tome's] people" had put through an order for 3,000 shares of St. Joe stock but that "he [Tome] hadn't personally placed the order." [30] Bronfman asked Tome, point blank, "Were those shares in any way beneficially owned by you or members of your family?" Tome responded unequivocally, "No."

Bronfman and Tome met again the next morning, April 7, at 10:00 a.m. at Bronfman's office. Bronfman's attorney was present at that meeting. This time Tome had an attorney present, who arrived at approximately 10:20 a.m. Bronfman and his attorney made it clear to Tome and his attorney that any conversations they would have that day would be reported to the SEC.

At this meeting, Tome "reiterated that none of [the 3,000 shares of St. Joe stock purchased] had gone into his accounts" and that neither he, his wife, his children, nor any members of his family had any beneficial interest in St. Joe stock. He again said that "his clerk" had heard rumors about St. Joe and had decided, on his own, to buy 3,000 shares and "put them in various accounts."

In addition, Tome asserted flatly that he had "absolutely nothing to do" with the St. Joe option purchases on March 10. In fact, in response to a question from Bronfman's lawyer concerning whether Tome had any reason to believe that the beneficial holder of the 3,000 St. Joe shares was in any way related to the beneficial holders of the St. Joe options involved in this suit, Tome said that "[n]o, he had no reason to think so." Tome disclaimed any direct or indirect beneficial interest in any option trades. He termed it a "coincidence" that on March 10th, in addition to the 3,000 shares, defendant BSI also purchased 1,055 St. Joe call options on 105,500 shares of stock for prices of either $25, $30, or $35 per share.

The canards were ultimately exploded. After the SEC's diligent investigation uncovered irrefutable evidence of Tome's involvement in the St. Joe option and stock trades, Tome's counsel conceded on the record that Tome had a beneficial interest in St. Joe stock purchases. [31] At trial, Tome's counsel and the Court engaged in the following colloquy:

30. Tome repeated a slightly different version of this lie to the head of Baird-Patrick, the U.S. brokerage firm with which Tome was associated.

31. Tome's counsel now concedes, in the face of irrefutable proof, that Tome had a beneficial interest in the NICO account.

Counsel: ... Tome was responsible for purchasing stock on March 10. That's not denied. There was an announcement—

The Court: You mean it's not any longer denied?

Counsel: It is not denied, your Honor.

The Court: He falsified about that initially, didn't he?

Counsel: I believe that the testimony of Bronfman indicates that he [Tome] was not candid about that fact, [J]udge.

The Court: That's the understatement of the year.

On April 8, 1981, Tome called Bronfman from Geneva, Switzerland, and in a belligerent tone accused Bronfman of getting him into this "mess." Tome claimed that Bronfman's lawyers were going to protect Bronfman and leave Tome "out in the cold." When Tome continued to talk to Bronfman in this belligerent tone, Bronfman terminated the call. Fifteen minutes later, Tome called him back, this time very distraught. Tome was concerned with the possibility of going to jail because if he did "his career would be finished." [32]

Sometime thereafter, Bronfman, strangely enough, asked his wife to call Tome's wife to tell her "Don't worry. We love you.... The reason Edgar's [Bronfman] not calling you is because he's being advised not to. But he still loves you."

### E. *Leati's Disclosures*

Leati himself admits that in a telephone conversation on March 10, 1981, Tome advised him to purchase St. Joe securities. Leati states that he got the "hint" to buy St. Joe from Tome when Tome said "I'd buy [St. Joe]." Leati claims, however, that he never heard of Seagram, as a company, until the official announcement of the tender offer nor did he know of Tome's (and Finvest Geneva's) relationship with Seagram. He claims that after Tome gave him the "hint" on St. Joe, he bought the stock not because of any knowledge of an imminent Seagram tender offer but because "the volume [of trading in St. Joe stock] was increasing in the days immediately prior to the transaction." In essence, Leati would have this Court believe that although he received the "hint" to buy St. Joe from Tome, Leati engaged in some sophisticated, independent market research and analysis after speaking to Tome and before making the actual decision to purchase St. Joe securities for the accounts of Lombardfin S.p.A.'s clients. That notion is unworthy of belief.

In fact, the volume was not steadily increasing in the week and days immediately prior to Lombardfin S.p.A.'s March 10 purchases.[33] More significantly, however, Leati placed the first order for St. Joe stock, 10,000 shares, approximately *two minutes* after finishing his telephone conversation with Tome.[34] Leati could not have had time to investigate the St. Joe stock before trading. In this regard, it is highly significant that before March 10, 1981, Lombardfin S.p.A. had never traded even one single share of St. Joe stock. On March 10, 1981, however, it traded more than 40,000.

Not surprisingly, Csopey, Leati's former partner at Lombardfin S.p.A., tells a very different—and more believable—version of what caused Lombardfin S.p.A. to trade in

32. Specifically, Tome told Bronfman that if Tome did not talk to the SEC, he could go to jail in the United States; conversely, if he did talk to the SEC, he could go to jail in Switzerland for violating Swiss secrecy laws.

33. At trial, Kevin Feehan, the New York Stock Exchange specialist in St. Joe during this period of time testified as follows:

The Court: ... so you had one day [Thursday, March 5] where there was a [trading] bulge and the other days generally subnormal ..., is that the story of that week [Monday, March 2 through Friday, March 6, 1981]?

Witness: That's the story of that week.

34. Tome's first call to Leati on March 10 was placed at 10:17 a.m. and lasted approximately five minutes. Leati's first trade *ever* in St. Joe securities, which he placed for the account of Credit Suisse Lausanne, was placed at 10:24 a.m.

St. Joe securities on March 10.[35] In his testimony, Leati was evasive and belligerent, often berating the attorney for asking a particular question. In sharp contrast, Csopey's testimony was careful and credible.[36]

Csopey was in charge of the Rome office of Lombardfin S.p.A.'s Italian domestic subsidiary—Leati was in charge of the Milan office—and thus was usually in Rome. On March 10, 1981, however, Csopey was in Milan to visit customers and to attend a Board meeting the next day.

While in the Milan office on March 10, Csopey and his then partner, Leati, had a private conversation in Leati's office. Leati told Csopey that Tome had called Leati from New York.[37] "Leati [ ] had been advised by Tome ... [t]hat Seagrams [sic] would make, in the next few days, make a tender offer for St. Joe Minerals." Leati said that, in exchange for $200,000, Tome was passing this information to Lombardfin S.p.A. for Lombardfin to take advantage of for itself and for its customers. This prospective payment to Tome was contingent upon there being a takeover and was to come not from Leati nor from Lombardfin S.p.A., but from those individuals profiting from Tome's information.

Leati discussed the reliability of Tome's information with Csopey, mentioned that Tome was a consultant to Seagram, and stated that "since Tome claimed to have a close personal relationship to Seagrams [sic], that this [information] could well be true."

Leati told Csopey that he had already bought some stock and options in St. Joe that day while Csopey was not in the office. Leati said that he had not spoken to any customers before placing trades on their behalf in St. Joe on March 10. Indeed, Csopey knew from his own experience that mobilizing so many trades in so short a period of time necessitated Leati to be acting on his own discretion, without first checking with customers.

At the end of this conversation, Leati, considering additional purchases of St. Joe securities, said to Csopey "Let's give it a try." In fact, Leati placed additional orders for St. Joe securities on March 11 before the New York Stock Exchange opened, but these orders could not be executed because the market opening in St. Joe was delayed by the Seagram tender offer announcement.

The next day, the Board meeting of Lombardfin S.p.A., and its Italian subsidiary, was interrupted by news of the Seagram tender offer for St. Joe. The discussion at the meeting then turned to St. Joe, with comments ranging from an estimate of the stock's opening price to regulatory consequences for the prior day's trading. Leati explained to the Board members, who were not intimately familiar with the mechanics of New York Stock Exchange trading,

**35.** For a discussion of defendants' hearsay objections to portions of Csopey's testimony, *see* the separate memorandum on evidentiary issues.

**36.** Moreover, Leati's testimony was taken in Italy under the restrictive Letter Rogatory procedure and Csopey's in New York under the much more liberal standard applicable under the Federal Rules of Civil Procedure.

Defendants, through innuendo, have attempted to attack Csopey's credibility by hinting at certain events surrounding a 1984 struggle for control of Lombardfin S.p.A. between Leati and Csopey. In September 1985, at his deposition in this country, Csopey denied categorically making any threats to discuss the St. Joe matter with the SEC if Leati did not sell his interest in Lombardfin S.p.A. to Csopey. Rather than cross-examining Csopey specifically on this point, bringing out whatever evidence Tome's counsel had to support such an accusation, and getting Csopey's response or explanation thereto, Tome's counsel *chose* to raise the issue collaterally, through the hints and specters of witnesses not available in this Court for testimony under the Federal Rules. Those 1984 events and defendants' innuendoes do not detract from the circumstantial credibility of Csopey's recital of the events of 1981. The credibility of Csopey's main accuser, Mrs. Arbucias, is seriously impaired in the totality of the evidence submitted and her allegations are not worthy of belief.

**37.** Like many of Csopey's other statements, this statement, which Csopey would have no reason to know except if Leati actually did tell him, is fully corroborated by independent evidence, *i.e.*, telephone records and Leati's own admission.

what was going on. In discussing the regulatory consequences, Leati admitted that the firm had committed a securities violation by trading on inside information but apparently downplayed the risk of being caught by remarking that Lombardfin S.p.A. had accounted for only a "small fraction" of the previous day's total trading volume. Csopey does not remember if, at that meeting, Tome was identified to the Board as the person providing the inside information. He was, at least, identified to them later.

On March 11, 1981, Leati told Csopey that Tome and Leati had exchanged telephone calls and Tome had told him that "[t]he launch of the [Seagram] takeover bid had been anticipated [i.e., accelerated] due to market action."

Throughout 1981, after the SEC had instituted this lawsuit, Tome regularly visited Lombardfin's office in Milan. When he was in Milan, Csopey and Tome had discussions about this lawsuit in general, particularly how large the legal fees were for all people concerned. Subsequently, Leati told Csopey that Tome had pressed Leati for contributions to the legal fees and to a pool which would settle the case. In fact, when Lombardfin S.p.A. itself began running up substantial legal fees in connection with this case Leati told Csopey that Leati should have anticipated these legal expenses and "taken account" of them in the money given to Tome for providing the inside information.

## II. INSIDER TRADING

The SEC brings this civil insider trading action, authorized by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d), seeking an injunction and other ancillary relief, including disgorgement of ill-gotten gains, against defendants based on defendants'

violations of the antifraud provisions of the securities laws and regulations. Subject-matter jurisdiction is based on Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa. For the reasons shown hereafter, the SEC is entitled to prevail.

■ The federal securities laws do not contain an express definition of insider trading. Instead, liability for insider trading has grown out of the antifraud provisions of the securities laws and regulations, primarily Section 10(b) and Rule 10b–5. As the Supreme Court has made clear, however, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Chiarella v. United States*, 445 U.S. 222, 232, 100 S.Ct. 1108, 1116–17, 63 L.Ed.2d 348 (1980). The gravamen of an insider trading violation under these provisions is breach of a fiduciary or similar duty of trust and confidence arising from some relationship. An individual trading on inside information in breach of such a duty, without prior disclosure,[38] commits fraud within the meaning of Section 10(b) and Rule 10b–5.

■ The term "insider trading" actually is a misnomer, only imperfectly describing the proscribed conduct, since liability under the securities laws can extend to those who are not insiders, as that term is commonly understood (*e.g.*, directors and officers of the corporation, *see Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 10 & n. 8 (2d Cir.1983), *cert. denied sub nom., Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684) (1984)), if these "outsiders" either become "temporary insiders"[39] of the corporation by legitimately being given access to confidential corporate information solely for corporate purposes, *Dirks v. SEC*, 463 U.S. 646, 655 n. 14, 103 S.Ct.

---

**38.** If the insider cannot disclose because of a duty not to reveal confidences, he must abstain from trading altogether. *United States v. Chiarella*, 588 F.2d 1358, 1365 & n. 9 (2d Cir.1978), *rev'd*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir.1968) (en banc), *cert. de-*

*nied sub nom., Kline v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See also infra* note 47.

**39.** The term "temporary insider" apparently was coined in *SEC v. Lund*, 570 F.Supp. 1397, 1403 (C.D.Cal.1983).

3255, 3262 n. 14, 77 L.Ed.2d 911 (1983), or become "tippees" by receiving inside information *improperly. Id.* at 660, 103 S.Ct. at 3264 (emphasis in original). Temporary insiders acquire independent fiduciary duties to the corporation and to its shareholders, and thus commit fraud within the meaning of Section 10(b) and Rule 10b–5 when they breach their fiduciary or similar duty of trust and confidence. Tippees, however, have no independent fiduciary or similar duty of trust and confidence to the corporation or to its shareholders; their liability for insider trading "is derivative from that of the insider's duty." *Id.* at 659, 103 S.Ct. at 3264. If there has been no breach by an insider (*i.e.,* the "tipper") in conveying the inside information to the tippee, there can be no derivative breach by the tippee. *Id.* at 662, 103 S.Ct. at 3265. Even if there has been a breach by the tipper of his fiduciary or similar duty of trust and confidence, the tippee only commits fraud within the meaning of Section 10(b) and Rule 10b–5 if the tippee trades on that inside information when he "knows or should know" that the inside information was conveyed to him in breach of the tipper's duty. *Id.* at 660, 103 S.Ct. at 3264.

■ Tippers are jointly and severally liable for the profits obtained (or losses avoided) by their tippees. *See Bateman Eichler, Hill Richards, Inc. v. Berner,* — U.S. ——, 105 S.Ct. 2622, 2630, 86 L.Ed.2d 215 (1985) ("A tippee trading on inside information will in many circumstances be guilty of fraud against individual shareholders, *a violation for which the tipper shares responsibility.*") (emphasis added); *Elkind v. Liggett & Myers, Inc,* 635 F.2d 156, 169 (2d Cir.1980).[40] Indeed, the Supreme Court has held that the tipper's conduct, almost invariably,· is more culpable than that of the tippee. *Bateman,* 105 S.Ct. at 2630–31. Tipper liability is neces-

sary so that a fiduciary does not attempt indirectly to do that which he may not do directly. *Dirks,* 463 U.S. at 659, 103 S.Ct. at 3264.

Before tipper and tippee liability arises under Section 10(b) and Rule 10b–5, however, there first must be a breach of the insider's fiduciary or similar duty of trust and confidence, satisfying the fraud element. "The test is whether the insider personally will benefit, directly or indirectly, from his disclosure." *Id.* at 662, 103 S.Ct. at 3265. Focusing on objective criteria, the court must find "a pecuniary gain or a reputational benefit that will translate into future earnings." *Id.* at 663, 103 S.Ct. at 3266. As examples of situations satisfying this breach requirement, the Supreme Court noted "a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter or an intention to benefit the particular recipient" and "a gift of confidential information to a trading relative or friend." *Id.* at 664, 103 S.Ct. at 3266 (emphasis in original). Determining whether the insider personally benefits from a disclosure is a question of fact. *Id.*

One relationship giving rise to a duty sufficient to support liability under Section 10(b) and Rule 10b–5 is a fiduciary or similar relationship of trust and confidence between the shareholders of the company whose stock is being traded and the individual trading. This is the relationship the Supreme Court focused on in *Chiarella* and *Dirks.* Recently, however, in actions brought by governmental agencies, the lower federal courts have been extending liability under Section 10(b) and Rule 10b–5 to other relationships, under a "misappropriation" theory.

■ The common-sense notion underlying the misappropriation theory is that one

---

**40.** Expanding on this reasoning, a tipper is liable for profits obtained (or losses avoided) from his tippee's trades, even if the tippee himself could not be held liable for those trades because he did not commit fraud within the meaning of Section 10(b) and Rule 10b–5, *i.e.,* if the tippee did not and should not have· known that the information was conveyed in breach of the tip-

per's fiduciary duty, or because he was not joined as a defendant in the action. *See Texas Gulf Sulphur Co.,* 401 F.2d at 852–53 (tipper held liable for Section 10(b) and Rule 10b–5 violations based on tippees' trades even though tippees not joined as defendants). A tipper's liability is independent, not derivative, of the tippee's.

who misappropriates valuable information for his own benefit, in breach of a fiduciary or similar duty of trust and confidence, has surely committed fraud on the person or entity to whom that duty is owed. The prerequisite for liability under the misappropriation theory is misuse of nonpublic information in breach of a fiduciary or similar duty of trust and confidence to *some* person or entity, although that person or entity need not necessarily be a purchaser or a seller of securities.[41] *See Report of The Task Force On Regulation of Insider Trading (part 1): Regulation Under The Antifraud Provisions of The Securities Exchange Act of 1934*, 41 Bus.Law. 223, 236 (Nov.1985) [hereinafter cited as ABA Report]. Thus, under the misappropriation theory, the scope of the duty required to ground liability is no different than the one outlined by the Supreme Court in *Chiarella*, and reiterated in *Dirks;*[42] the person or entity to whom that duty is owed, however, for purposes of liability under Section 10(b) and Rule 10b–5, is not limited solely to shareholders of the corporation whose stock is being traded (*i.e.*, the target company in a takeover situation) or to that corporation itself.

The Second Circuit, by a divided Court, has just held that the fraud element of a 10b–5 violation is satisfied when a defendant newspaper writer misappropriates, and then trades on (or tips others who trade on), nonpublic information on forthcoming articles to be published regarding the subject securities, in breach of a fiduciary or

similar duty of trust and confidence to the newspaper. The violators did not breach a duty directly or derivatively to anyone involved in acquiring the securities. *United States v. Carpenter*, 791 F.2d 1024, 1029 (2d Cir.1986) ("the misappropriation theory more broadly proscribes the conversion by 'insiders' *or others* of material non-public information in connection with the purchase or sale of securities.") (emphasis in original).

This "misappropriation" theory of liability under Section 10(b) and Rule 10b–5 first appeared in the case law in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), when the government urged the Court to affirm Chiarella's conviction for insider trading on the alternative basis that Chiarella, an employee of a financial printer employed by an acquiring corporation involved in a tender offer, violated Section 10(b) and Rule 10b–5 when he breached his duty of confidentiality to the acquiring corporation by acting upon information he received by virtue of his employee status. *Id.* at 235, 100 S.Ct. at 1118.

The Court held that "it need not decide whether this theory has merit for it was not submitted to the jury." *Id.* at 236, 100 S.Ct. at 1118. Four Justices, however, explicitly voiced their view that a defendant violates Section 10(b) and Rule 10b–5 when misappropriating, and then trading on (or tipping others who trade on), nonpublic information in breach of a fiduciary or sim-

---

**41.** Because of the judicially-created standing requirement limiting private Rule 10b–5 damage claims to purchasers or sellers of securities, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975), the extension of liability under Section 10(b) and Rule 10b–5 made possible by the misappropriation theory will be useful only for actions instituted by governmental agencies, such as the SEC under section 21 or the United States Attorney under section 32 of the Exchange Act. Prudent exercise of these governmental agencies' inherent prosecutorial discretion no doubt will limit even further the actions brought under the misappropriation theory.

**42.** In *United States v. Reed*, 601 F. Supp. 685 (S.D.N.Y.) (upholding the sufficiency of an in-

dictment for insider trading on the theory that a son had misappropriated from his father confidential information concerning a forthcoming merger), *rev'd as to venue*, 773 F.2d 477 (2d Cir.1985), after a scholarly review of the concepts of "fiduciary relationship" and "confidential relationship" as those terms have been understood in the law, *id.* at 703–18, the District Judge concluded that "[t]he repeated disclosure of secrets by the parties or by one party to the other may in the final analysis suffice to support a finding of a confidential relationship" sufficient to ground liability under Section 10(b) and Rule 10b–5. *Id.* at 717. Determining whether a confidential relationship exists is a question of fact. *Id.*

ilar duty of trust and confidence. *See id.* at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting) (Chiarella "misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence."); *id.* at 239, 100 S.Ct. at 1120 (Brennan, J., concurring); *id.* at 245, 100 S.Ct. at 1123 (Blackmun, J., joined by Marshall, J., dissenting). More recently, in *Bateman, Eichler, Hill Richards v. Berner*, —— U.S. ——, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), seven Justices joined an opinion stating that "[w]e also have noted that a tippee may be liable [under Rule 10b–5] if he otherwise 'misappropriate[s] or illegally obtain[s] the information.'" *Id.* at 2630 n. 22 (quoting *Dirks v. SEC*, 463 U.S. 646, 665, 103 S.Ct. 3255, 3265, 77 L.Ed.2d 911 (1983)). The two Justices who did not join the *Bateman* opinion (Justice Marshall did not participate and the Chief Justice concurred) were ones who in *Chiarella* had explicitly approved the misappropriation theory.

Although the Supreme Court has not yet explicitly decided the validity of the misappropriation theory of liability under Section 10(b) and Rule 10b–5, all nine current members of the Court appear to support the misappropriation theory.

Significantly, in the interim between the *Chiarella* and the *Bateman* decisions, the Congress has expressly approved the misappropriation theory as being consistent with the purposes of the antifraud provisions of the securities laws. *See Carpenter, supra,* at 1030 (finding "persuasive" the congressional intent expressed in the ITSA). In the House Committee Report accompanying the Insider Trading Sanctions Act of 1984 ("ITSA"), Pub.L. No. 98–376, 98 Stat. 1264 (codified in scattered sections of 15 U.S.C.) (there was no Senate report), the Congress, citing with approval the Second Circuit's decision in *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981), *conviction aff'd without published opinion*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), which upheld the legal sufficiency of a criminal indictment under Section 10(b) and Rule 10b–5 based on the misappropriation theory, stated that:

[I]n certain widely-publicized instances, agents of tender offerors and persons contemplating a merger or acquisition have used for personal gain information entrusted to them solely for a business purpose. Such conversion for personal gain of information lawfully obtained abuses relationships of trust and confidence and is no less reprehensible than the outright theft of nonpublic information. In other areas of the law, deceitful *misappropriation* of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. The Congress has not sanctioned a less rigorous code of conduct under the federal securities laws.

H.Rep. No. 355, 98th Cong., 2d Sess. 4–5 (1983) [hereinafter cited as ITSA House Report], *reprinted in* 1984 U.S.Code Cong. & Ad.News 2274, 2277–78 (footnotes omitted and emphasis added). Although Congress, in the ITSA, increased the sanctions available for insider trading violations, it did not attempt to provide a definition of insider trading because—once again expressly citing the Second Circuit's decision in *United States v. Newman, supra* —"[t]he Committee believes that the law with respect to insider trading is sufficiently well-developed at this time to provide adequate guidance." *Id.* at 13, *reprinted in* 1984 U.S.Code Cong. & Ad.News at 2286.

Frequently, the misappropriation theory will hold liable those persons breaching a duty of trust and confidentiality to a tender offeror. Indeed, insiders of a tender offeror, because they are often the only ones with advance knowledge of an impending hostile tender offer, are the ones most likely to trade (or tip) on nonpublic information regarding a hostile tender.

The problem of insider trading on tender offers has become particularly acute, especially in conjunction with the greater availability of option contracts. Persons with advance knowledge of a tender offer announcement have opportunities to profit substantially in a short time with little or no risk of loss. These opportunities can be greatly maximized on the options market

because the value of an option contract tends to increase by a much greater percentage than the value of the underlying stock.

By enacting the ITSA, Congress has expressed its heightened concern over the growing problem of insider trading. One of the ITSA's provisions is an amendment to section 21(d) of the Exchange Act, expanding the SEC's enforcement remedies; it gives the SEC the authority to seek from anyone violating the insider trading laws a civil penalty of up to three times the amount of the profit gained (or loss avoided) by the insider trading.[43]

Against the background of this analytic framework and heightened Congressional concern, we turn to the liability of the individual defendants in this case.

### III. LIABILITY

A. *Tome's Liability*[44]

1. *Violation of Section 10(b) and Rule 10b–5*

█ In order to prove its civil claim against Tome for violation of Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5 (1985), the SEC must establish by a preponderance of the evidence,[45] (1) a misrepresentation, or an omission (where there is a duty to speak), or other fraudulent device; (2) in connection with the purchase or sale of any security; (3) scienter by the defendant in making that misrepresentation or omission, *Aaron v. SEC*, 446 U.S. 680, 691, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980); and (4) materiality of that misrepresentation or omission. *See Angelastro v. Prudential-Bache Securities, Inc.*, 764 F.2d 939, 942 & n. 5 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 744 (5th Cir.1984); *SEC v. Washington County Utility District*, 676 F.2d 218, 225 (6th Cir.1982). *See generally ABA Report, supra,* 41 Bus.Law. at 231.[46]

a. *Misrepresentation, Omission, or Other Fraudulent Device*

█ Tome is liable under the misappropriation theory for the St. Joe purchases

---

**43.** Since this penalty provision was enacted after the St. Joe purchases at issue here, it is not applicable to this case. The SEC has not argued that this penalty provision should be applied retroactively.

**44.** The "fugitive from justice" rule limits a fugitive litigant's access to the courts for proceedings, both civil and criminal, related to the criminal proceedings in which he has refused to appear. *United States v. $45,940 In United States Currency*, 739 F.2d 792, 798 (2d Cir.1984); *see also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1573 n. 2, 84 L.Ed.2d 605 (1985); *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (per curiam); *Conforte v. Commissioner*, 459 U.S. 1309, 1312, 103 S.Ct. 663, 664, 74 L.Ed.2d 588 (1983) (Rehnquist, J., in chambers). Since Tome's liability under the securities laws and regulations is clear, however, it is unnecessary to decide whether his "constructive flight," *see United States v. Catino*, 735 F.2d 718, 722 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), from the related criminal proceeding, S 84 Cr. 534 (S.D.N.Y. filed August 7, 1984) affects his standing to defend this civil action. *See United States v. Baccollo*, 725 F.2d 170, 172 (2d Cir.1983). This issue, however, may gain added significance on appeal since Tome then will be at-

tempting to *invoke* the jurisdiction of the appellate court.

**45.** The preponderance of the evidence standard is the proper burden of proof both in injunctive actions brought by the SEC, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691–92, 74 L.Ed.2d 548 (1983) (action by private litigants to establish fraud under Section 10(b) of the Securities Exchange Act of 1934); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88 (1934) (action by the SEC to establish fraud under Section 17(a) of the Securities Act of 1933); *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978) (Friendly, J.), and in administrative proceedings before the SEC. *Steadman v. SEC*, 450 U.S. 91, 95, 101 S.Ct. 999, 1004, 67 L.Ed.2d 69 (1981).

In the ITSA House Report, the Committee stated that although Congress was increasing the sanctions available for insider trading violations, it did "not intend[ ] to require a higher standard of proof than the 'preponderance of the evidence' test now applicable to Commission injunctive actions." H.Rep. No. 355, 98th Cong., 2d Sess. 9 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad.News 2274, 2282.

**46.** Private litigants asserting a cause of action under Rule 10b–5 have the additional burden of

directly ordered by him for his NICO, TFCO, and Finvest Panama accounts at BSI since he "fail[ed] to disclose material nonpublic information before trading on it and thus ma[de] 'secret profits.' " [47] *Dirks v. SEC*, 463 U.S. 646, 654, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983). He is also jointly and severally liable, with his tippees, for the St. Joe purchases of those he tipped since he improperly disclosed confidential corporate information to the tippees in breach of his fiduciary or similar duty of trust and confidence to Seagram, its shareholders, and Bronfman.

At the time he bought St. Joe securities and tipped others to do likewise, Tome was an insider of Seagram, the tender offeror. Bronfman and Seagram reposed their trust and confidence in Tome's integrity; Tome callously and willfully betrayed that trust.

For many months, Bronfman had provided Tome with detailed (and continually updated) nonpublic information concerning Seagram's acquisition plans, solely for the confidential corporate purpose of evaluating Seagram's alternatives and gauging the European investment community's reaction to such a move.

The Supreme Court has recognized that persons, such as Tome here, given access to confidential corporate information solely for corporate purposes become temporary insiders of that corporation, thereby acquiring the same fiduciary duties to the corporation as other insiders:

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons ac-

quired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.... When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee.... For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

*Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14.

Seagram and Bronfman of course expected their confidences to Tome to be kept confidential by him. The relationship between the management of a corporation and its financial advisors and consultants regarding prospective hostile tender offers is inherently one which implies a duty of confidentiality. Seagram and Bronfman certainly had such an expectation of confidentiality. As soon as Bronfman learned of this lawsuit and suspected that Tome's duty of confidentiality had been breached, Bronfman called Tome in Switzerland "to make doubly sure" Tome had not been involved in the illegal St. Joe purchases alleged in the SEC's complaint. Tome, on his part, explicitly acknowledged his obligation to keep the information he received confidential when he lied to Bronfman about trading on the inside information he had. Had there been no expectation of confidentiality, there would have been no need for Tome to lie about his trading (and tipping) in St. Joe securities when Bronfman specifically questioned him.

Tome breached his fiduciary or similar duty of trust and confidence by trading for

---

proving (5) justifiable reliance upon the plaintiff's fraudulent device; and (6) damages resulting from the fraudulent device. In an SEC enforcement action, however, proof of these additional elements is not required.

**47.** This Opinion need go no further than enforcement of the duty not to trade without disclosure to the beneficiary of the fiduciary relationship. *But see Carpenter, supra,* at 1034 ("be-

cause of [defendant Winan's] duty of confidentiality to the [*Wall Street*] *Journal,* [all] defendant[s] ... had a corollary duty, which they breached ... to abstain from trading in securities on the basis of the misappropriated information or to do so only upon making adequate disclosure *to those with whom they traded.*") (emphasis added).

his own behalf in the St. Joe options purchased for his NICO, TFCO, and Finvest Panama accounts at BSI. He also breached his duty by tipping others, expecting in exchange both money (the $200,000 he demanded Leati obtain from the benefitting customers of Lombardfin S.p.A.) and reputational benefits as a securities broker, that no doubt subsequently would result in increased business for him and his company, Finvest Geneva.

Tome, therefore, traded and tipped on the confidential inside information he received from Seagram and Bronfman about St. Joe, in breach of his fiduciary duty to Seagram, its shareholders, and Bronfman. He thereby committed fraud within the meaning of Section 10(b) and Rule 10b–5 by misappropriating valuable corporate information for his own benefit.

### b. *In Connection With*

This requirement is easily satisfied since "[t]he information [Tome] stole ha[d] no value whatsoever except 'in connection with' his subsequent purchase of securities." *SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). The sole purpose of Tome's theft of confidential information regarding Seagram's tender offer plans "was to reap instant no-risk profits in the stock market." *Id.; see Newman,* 664 F.2d at 18.

### c. *Scienter*

■ Although reckless deception satisfies the scienter requirement, *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *IIT v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980),[48] there is abundant evidence that Tome acted knowingly and intentionally in connection with his fraudulent activity. His frantic trading and tipping on March 10th and 11th, together with his eloquent silence concerning

his frantic trading in St. Joe options when meeting Bronfman socially on the evening of March 11th—even though Bronfman was discussing with Tome the intimate details of the just-completed Seagram tender offer for St. Joe—and his subsequent lies when questioned specifically whether he had a beneficial interest in any St. Joe trades, all lead inescapably to the conclusion that Tome acted knowingly and intentionally in connection with his fraudulent activity. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 167 (2d Cir.1980) ("One who deliberately tips information which he knows to be material and non-public to an outsider who may reasonably be expected to use it to his advantage has the requisite scienter.") (footnotes omitted).

### d. *Materiality*

■ Tome clearly was in possession of material, nonpublic information when he breached his fiduciary or similar duty of trust and confidence to Seagram, its shareholders, and Bronfman by trading (and tipping). Information is material if there is a "substantial likelihood" that the information would be significant to a "reasonable investor" in making his or her investment decisions. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (defining materiality under proxy regulation Rule 14a–9); *Elkind,* 635 F.2d at 166 (applying the *TSC* standard to an action under Section 10(b) and Rule 10b–5, holding it to be "a relevant question in determining materiality ... whether the ... information ... would have been likely to affect the decision of potential buyers and sellers.").

■ Through the myriad disclosures by Bronfman to Tome concerning Seagram's confidential tender offer plans and potential targets, and the information concerning the Seagram parent company's Montreal Board meeting, Tome knew that Seagram's

---

**48.** The Supreme Court has not yet decided whether reckless deception satisfies the scienter requirement under Section 10(b) and Rule 10b–5. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Since *Hochfelder,* however, ten different courts of appeals have either held or assumed that reckless deception is sufficient. *See ABA Report, supra,* 41 Bus.Law. at 241 n. 70 (collecting cases).

tender offer for St. Joe was imminent. Knowledge of an impending tender offer that has not previously been announced publicly is clearly material information. *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47–48 (2d Cir.1976) (holding knowledge of a proposed merger to be material information in the context of an insider trading case). The significance of this information to investors is highlighted by the temporary halting of trading in St. Joe securities and by the virtually immediate jump in price of St. Joe stock from approximately $30 per share to approximately $45 per share when the Seagram tender offer was publicly announced on March 11. *See Elkind*, 635 F.2d at 166 (reaction of investors to the information is an indication of its materiality).

### 2. *Violation of Section 14(e) and Rule 14e–3*

The SEC argues that Tome (and the other defendants) also violated Section 14(e) and Rule 14e–3, 15 U.S.C. § 78n(e) and 17 C.F.R. § 240.14e–3, and that unlike a violation of Section 10(b) and Rule 10b–5, a violation of Rule 14e–3 does not require the SEC to prove scienter. *See Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 599 F.Supp. 1468, 1472–73 (S.D.N.Y.1984) (holding that a violation of Rule 14e–1(c) does not require proof of scienter); *Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 615 F.Supp. 96, 99 (S.D.N.Y.1985) (same, expressly citing *Schreiber*, at 101); *cf. Schreiber v. Burlington Northern, Inc.*, —— U.S. ——, 105 S.Ct. 2458, 2464 n. 11, 86 L.Ed.2d 1 (1985) (stating that the SEC has "latitude to regulate nondeceptive activities" under Section 14(e) ). *But cf. id.* at 2646 (stating that Section 14(e) is "modeled on the antifraud provisions" of Section 10(b) and Rule 10b–5). Since scienter is clearly present in this case, and since defendants' liability is clear under Section 10(b) and Rule 10b–5, it is unnecessary also to decide that defendants could be held liable without proof of scienter under Section 14(e) and Rule 14e–3. *See Materia*, 745 F.2d at 203 n. 5.

### B. *The Panamanian Defendants' Liability*

The Panamanian defendants, NICO, TFCO, and Finvest Panama, in a joint post-trial memorandum with Tome, concede that "[t]here is no question but that Tome directed and controlled the transactions at issue as agent of the Panamanian corporations, and consequently, whatever information Tome utilized in causing the Panamanian defendants to engage in these transactions may properly be imputed to them." Defendants' (Tome, NICO, TFCO, Finvest Panama) Post-Trial Memorandum, at 53.

We need not decide whether secondary liability can be imposed in this case upon the Panamanian defendants as controlling persons under Section 20(a), 15 U.S.C. § 78t(a),[49] since it is clear that common law agency concepts apply to violations of Section 10(b) and Rule 10b–5. *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir.1983); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975); *but cf. id.* at 813 ("We need not decide today whether the entire corpus of agency law is to be imported into the securities acts for all purposes."). Indeed, "since a corporation can act only through its agents," *id.* at 812, a corporation is liable, as a principal, for the actions of its responsible officers and authorized agents. *A.J. White & Co. v. SEC*, 556 F.2d 619, 624 (1st Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *Verrecchia v. Paine, Webber, Jackson & Curtis*, 563 F.Supp. 360, 364–65 (D.P.R.1982). Since, as defendants concede, Tome had actual authority to purchase the St. Joe options at issue here, under general agency principles, the Panamanian defendants are equally liable for Tome's violations of Section 10(b) and Rule 10b–5.

---

**49.** In order to establish secondary liability under Section 20(a), three elements must be proved: "(1) a primary violation, (2) scienter, and (3) control of the primary violator by the defendant." *Index Fund, Inc. v. Hagopian*, 609 F.Supp. 499, 511 (S.D.N.Y.1985).

## C. *Leati and Lombardfin S.p.A.'s Liability*

Although defendants Tome, NICO, TFCO, and Finvest Panama, through counsel, have appeared in this action, Leati, Lombardfin S.p.A., and the Unknown Purchasers have not appeared.

Originally, when this suit was filed in March 1981, the SEC was not then able to determine exactly who had engaged in the trades complained of, only that the trades had taken place. To an extent, particularly with the Unknown Purchases, because of foreign secrecy laws, that problem still exists. When the SEC was able to determine exactly who was behind the trades, it amended the title of the suit, adding those additional defendants who had previously only been identified by category (*i.e.*, as "Unknown Purchasers"). At trial, on October 23, 1985, this Court, by default, granted plaintiff SEC's motion to amend the title of the lawsuit to add Leati and Lombardfin S.p.A. as defendants. Leati's testimony was taken in Italy in October 1985 pursuant to the Letter Rogatory procedure. Before then, the testimony of Csopey, which incriminates Leati as an active participant in this illegal trading activity, had been taken in New York in September 1985. Leati and Lombardfin S.p.A., therefore, clearly were aware of the pendency of this litigation but chose not to participate in it. In addition, after this suit was filed, in May 1982 the SEC effected personal service on all defendants pursuant to Rule 4, Federal Rules of Civil Procedure, by publication of a Summons with Notice of the pendency of this suit in newspapers of general circulation in Europe, including the *International Herald Tribune*. Leati read the *International Herald Tribune* in 1981.

■ Leati, as Tome's tippee, committed fraud within the meaning of Section 10(b) and Rule 10b–5 because, as the testimony of Csopey (admissible against Leati as a party admission) makes clear, Leati knew or should have known that Tome's disclosures to him were made in breach of Tome's fiduciary or similar duty of trust and confidence to Seagram, its shareholders, and Bronfman. *Dirks*, 463 U.S. at 660, 103 S.Ct. at 3264. Leati was a participant after the fact in Tome's fraudulent breach. *Id.* at 667, 103 S.Ct. at 3268; *Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115 n. 12. For the same reasons as were stated when discussing Tome's liability, the fraud was "in connection with" Leati's purchase of St. Joe securities and the information was clearly material. Finally, Csopey's testimony makes it clear beyond peradventure of doubt that Leati had the requisite scienter, *i.e.*, that he intentionally and knowingly participated in this fraudulent scheme to trade on inside information. Although it appears that Leati did in fact have a beneficial interest in at least some of the accounts for which he purchased St. Joe securities, he need not necessarily have had a beneficial interest in the accounts in order to be held liable under these antifraud provisions. If in fact any personal benefit is necessary to hold tippees liable under Section 10(b) and Rule 10b–5,[50] the commissions and reputational benefits Leati expected to enjoy from this fraudulent scheme clearly suffice. Leati is liable to account for the illegal St. Joe trades in which he engaged.

■ Leati is Lombardfin S.p.A.'s founder, majority stockholder, vice-chairman of the Board of Directors, and general manager. In addition to an agency theory of liability, discussed previously in relation to the Panamanian defendants, the SEC urges that Lombardfin S.p.A. is liable for Leati's Section 10(b) and Rule 10b–5 violations under the doctrine of *respondeat superior. See Marbury Management, Inc. v. Kohn,*

---

**50.** Since tippees are liable as participants after the fact in the insider's breach of his fiduciary or similar duty of trust and confidence—which breach requires some personal gain to the insider—and are therefore not required to have independently breached some duty, it is not clear that tippees must personally benefit from their trades or subsequent tips to others to be held liable under Section 10(b) and Rule 10b–5 (*e.g.*, a tippee who does not trade but who merely tips another who trades), although it appears likely that in a majority of cases some personal benefit to the tippee will be present.

629 F.2d 705, 716 (2d Cir.) (holding the doctrine applicable to a 10b–5 claim against a broker trainee who had held himself out as a broker and had accounted to his employer for all buying and selling transactions in which he had engaged), *cert. denied sub nom., Wood Walker & Co. v. Marbury Management Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1356–57 (S.D.N.Y.) (holding the doctrine inapplicable to an insider trading case since the unauthorized trading was not within the scope of employment), *aff'd*, 719 F.2d 5 (2d Cir.1983), *cert. denied sub nom., Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *O'Connor*, 529 F.Supp. at 1194 (same). But because of Leati's prominent position in Lombardfin S.p.A., it is not necessary to rely on the doctrine of *respondeat superior* to hold Lombardfin S.p.A. liable. In the context of a Rule 10b–5 claim, the Third Circuit appositely held that:

> high ranking officers in a corporation, or partners in a partnership, present a different situation from lower level employees. Officers are able to make policy and generally carry authority to bind the corporation. Their action in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior.

*Sharp v. Coopers & Lybrand*, 649 F.2d 175, 182 n. 8 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). Because of Leati's violations of Section 10(b) and Rule 10b–5, Lombardfin S.p.A. is jointly liable for Leati's trading in St. Joe securities.

#### D. *BSI's Liability*

Two million dollars and 1,200 shares of Fluor Corporation stock, plus dividends, are frozen in BSI's account at Irving Trust Company, in the City of New York, pursuant to this Court's previous orders. Shortly before Seagram announced a tender offer for St. Joe Mineral stock, BSI bought 1,055 call option contracts on the Philadelphia, Pennsylvania options market for its bank customers through an American stockbroker to acquire shares of St. Joe Minerals and purchased 3,000 shares of such stock. Shortly thereafter, it ordered the liquidation of the call options for $1,849,843.13, and the liquidation of 2,000 of the 3,000 shares for $92,739.35. The proceeds wound up in the BSI account at Irving Trust Company, and were there when this Court froze the account on application of the SEC.

BSI balances at the Irving Trust Company at the close of business on March 27, 1981 consisted of cash deposits of not less than $4,900,000, and United States marketable securities of a then-market value of not less than $326,000,000. Irving Trust Company appeared before the Court and conceded that it was in the position of a stakeholder of the proceeds of the trades in St. Joe Minerals. BSI appeared before the Court and stated its consent to an order providing for the temporary security in the amount of two million dollars *to cover* proceeds with respect to the questioned transactions, and thereupon requested the release of the balance of the BSI bank account. That consent and security "to cover" the avails of the trading was renewed from time to time, and continues to exist right down to date.

Efforts to disclose the alleged anonymous customers of the bank were thwarted for a substantial period, but ultimately it was established that the Panamanian defendants referred to above were the purchasers and sellers of the calls and the stock. BSI was represented before the Court in this action, its counsel stating, as early as June 12, 1981, "However, with respect to the $2 million which we are prepared to consent to, we are clearly in that regard willing to allow this court *in rem* jurisdiction to the extent of that $2 million. We have no difficulty in that regard." On the representation of BSI, it seemed to the Court that the amount frozen in the New York account seemed to be adequate "to cover" the liability asserted against the then-Unknown Purchasers, la-

ter identified as the Panamanian defendants.

During the course of the litigation, it was represented to the Court that Swiss authorities had frozen funds of Unknown Purchasers at its Lugano branch. Whether the Unknown Purchasers were only the Panamanian defendants, or purchasers in addition thereto, is not clear. To avoid any juggling of the accountability for the improper trading of the Panamanian defendants as between the Lugano branch and the frozen account of BSI in New York, the Court ordered the New York branch of BSI to request that any proceeds of St. Joe trading attributable to the Panamanian companies and frozen in the Lugano offices be transferred to the New York branch, and thereafter be paid into Court to be included in the avails, subject to the disgorgement directed hereafter.

Double-payment of the avails of the trading is not intended; only that BSI be required to turn over to the plaintiff two million dollars "to cover" the proceeds for which the Panamanian defendants are accountable under the findings in this decision. Additionally, BSI is ordered to pay the 1,200 shares of Fluor Corporation, together with dividends accumulated thereon since March 1981, proceeds from the illegal St. Joe trades held by Irving Trust Company, into the Court forthwith. Until these events have occurred, the freeze on the two million dollars in BSI's account at Irving Trust Company remains in effect. The next section of this decision deals with Unknown Purchasers other than the Panamanian defendants.

### E. *Unknown Purchasers*

The Court has been informed that the Government of Switzerland has frozen at least some Unknown Purchasers' accounts containing funds relating to the illegal St. Joe transactions discussed herein. The Court dismisses, and does not adjudicate, the claims of the SEC against the Unknown Purchasers, without prejudice to any subsequent action by the SEC to determine the identities of the Unknown Purchasers or to attempt to collect the Unknown Purchasers' profits from their unlawful St. Joe purchases. Additionally, the claims of the SEC not adjudicated herein are severed and discontinued, without prejudice, to the extent that it subsequently may be discovered that Tome, Leati, Lombardfin S.p.A., or the Panamanian defendants have a further beneficial interest in any funds or accounts of the Unknown Purchasers frozen by the Swiss Government or frozen in BSI's Lugano office or located in Guernsey.

### F. *Remedies*

#### 1. *Disgorgement*

Defendants Tome, NICO, TFCO, and Finvest Panama contend that even if they are found to have violated the securities laws and regulations, disgorgement of ill-gotten gains is an inappropriate remedy in actions brought under the misappropriation theory. These defendants argue that since private plaintiffs themselves could not sue to recover these defendants' illegal profits (because of judicially-created standing requirements for a private cause of action under Rule 10b–5, *see supra* note 41), allowing the SEC to do so would constitute an unauthorized "penalty." In essence, these defendants argue that although they were caught violating the law and reaping millions of dollars in illegal profits in so doing, once caught they need not account to anyone for these illegal profits. Neither existing case law nor policy considerations supports such an inequitable result.

In a Second Circuit decision on the misappropriation theory, the court affirmed the district court's order of disgorgement of ill-gotten gains, noting that "[d]isgorgement of illegally obtained profits is by no means a new addition to this category of permissible equitable remedies [under Section 21(d)]." *Materia*, 745 F.2d at 201. And Congress, in enacting the enhanced penalties for insider trading under the ITSA, has recently underscored the importance of the disgorgement remedy in SEC injunctive actions:

The principal, and often effectively [the] only, remedy available to the Com-

mission against insider trading is an injunction against further violations of the securities laws and disgorgement of illicit profits.

ITSA House Report, *supra*, at 7, *reprinted in* 1984 U.S.Code Cong. & Ad.News at 2280. In enacting these increased sanctions, Congress expressed its belief that disgorgement of illegal profits was insufficient to deter insider trading:

> Disgorgement of illegal profits has been criticized as an insufficient deterrent, because it merely restores a defendant to his original position without extracting a real penalty for his illegal behavior. The risk of incurring such penalties often fails to outweigh the temptation to convert nonpublic information into enormous profits.

*Id.* at 7–8, *reprinted in* 1984 U.S.Code Cong. & Ad.News at 2280–81. If the Congress believes that even full disgorgement of profits is an insufficient deterrent to insider trading, *a fortiori* less than full disgorgement, or as the defendants argue, none, is even more ineffectual. Long ago, in the first court of appeals decision ordering disgorgement in an SEC enforcement action, the Second Circuit recognized that those who trade on inside information are simply after quick, no-risk profits, and therefore that the most effective means to deter such behavior is to make the activity unprofitable. *Texas Gulf Sulphur*, 446 F.2d at 1308 ("It would severely defeat the purposes of the [Exchange] Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation."); *see also CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir. 1986) ("disgorgement serves the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of law."); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.").

At bottom, the defendants' arguments rest on the proposition that the SEC stands in the shoes of private litigants in bringing this injunctive proceeding. Such an assertion, however, was affirmatively rejected in *SEC v. Petrofunds, Inc.*, 420 F.Supp. 958, 960 (S.D.N.Y.1976):

> [There is a] critical distinction between actions brought by the SEC and actions brought by private litigants. Regardless of the fact that defendants may be required to disgorge profits, the SEC in no way stands in the shoes of a private litigant with respect to its claims for ancillary relief.

*See also Management Dynamics*, 515 F.2d at 808 ("the SEC appears in these proceedings not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."). Disgorgement, therefore, is an appropriate, indeed an essential, remedy in an SEC enforcement action based on a misappropriation theory of insider trading liability.

The defendants found liable herein shall account for and disgorge all profits and dividends received or credited, plus interest at the average prime rate from March 11, 1981 to the date of this Opinion, from any purchases of St. Joe stock or options between February and March 11, 1981. Defendant Tome is liable (1) individually, for accounts in which he held any economic, beneficial, or discretionary interest, and (2) jointly and severally with his tippees, the Panamanian defendants (NICO, TFCO, Finvest Panama), Leati, and Lombardfin S.p.A., for accounts in which those tippees, direct and secondary, held any economic, beneficial, or discretionary interest. Without limiting the scope of liability, Tome is liable for all profits and dividends plus interest, from all St. Joe stock and option purchases discussed in this Opinion. Tome's liability is joint and several with that of the Panamanian defendants for the St. Joe options purchased for the NICO, TFCO, and Finvest Panama accounts at BSI, and with Leati and Lombardfin S.p.A. for the St. Joe stock and option purchases placed by Leati or his subordinates for Lombardfin S.p.A.'s clients. These defendants are ordered to pay these amounts into the Court to be included in the amount

subject to disgorgement. The decree to be submitted herein should set forth a plan for disgorgement and administration of the fund to be created, taking due account of similar plans previously utilized in like decisions.

### 2. *Permanent Injunction*

Once the SEC has proven a defendant's violation of the securities laws and regulations, it makes a "proper showing" for permanent injunctive relief, within the meaning of Section 21(d), by demonstrating, by a preponderance of the evidence, a "reasonable likelihood that the wrong will be repeated." *Manor Nursing Centers,* 458 F.2d at 1100–01; *see also Management Dynamics,* 515 F.2d at 807. In determining whether a permanent injunction is appropriate, a "district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *Manor Nursing Centers,* 458 F.2d at 1102; *see also Management Dynamics,* 515 F.2d at 807 ("Whether the inference that the defendant is likely to repeat the wrong is properly drawn, however, depends on the totality of the circumstances ..."); *see also SEC v. Monarch Fund,* 608 F.2d 938, 943 (2d Cir.1979); *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 99 (2d Cir.1978); *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir.1977); *CFTC v. U.S. Metals Depositary Co.,* 468 F.Supp. 1149, 1161–62 (S.D.N.Y. 1979). The Second Circuit has provided additional guidance by enumerating specific factors the court should consider in making this determination:

> The factors which [a district judge] may consider include the likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied sub nom., Homans v. SEC,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

Applying these factors to this case, it is clear that the SEC is entitled to injunctive relief against defendants Tome, the Panamanian defendants, Leati, and Lombardfin S.p.A. and this court so orders. Tome acted intentionally in deceiving Bronfman and Seagram, abusing his position of trust and confidence, eventually lying about his activities when questioned specifically. *SEC v. Aaron,* 605 F.2d 612, 624 (2d Cir.1979) ("the [district] court's finding that appellant acted with scienter underscore[s] the need for an injunction."), *vacated on other grounds,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Tome not only traded for himself, but tipped others to encourage them to engage in illegal conduct. In fact, the evidence indicates that, before the St. Joe trades forming the basis of this suit, Tome had engaged in other trades on inside information confidentially disclosed by Bronfman concerning Seagram's tender offer plans. Tome has not indicated any remorse for his actions, except in being caught. He has remained outside the United States to avoid prosecution on a related criminal charge. In addition, his position as a broker and financial advisor would enable him to violate the law again.

The Panamanian defendants have not admitted their complicity in this scheme either. Tome has a beneficial interest in these accounts, and had discretionary power over them. Finvest Panama is part of Tome's Finvest Group, his financial network. Should Tome attempt to violate the law again, it appears likely that he would attempt to use these corporate entities to do so.

Leati acted intentionally in engaging in the St. Joe trades on the basis of Tome's inside information. Indeed, there is evidence in the record that Leati previously traded on Tome's inside information. He has expressed no remorse for what he did; in fact, he has refused to appear in this action. His position as a broker and finan-

cial advisor would enable him to violate the law again.

As discussed previously, Lombardfin S.p.A. is dominated by Leati, both as owner and as manager. Csopey testified that other high-ranking officials of Lombardfin S.p.A. knew about the illegal trading shortly after its occurrence but did nothing to rectify the situation. Should Leati attempt to violate the law again, it appears likely that he would attempt to use Lombardfin S.p.A. to do so.

For these reasons, Tome, NICO, TFCO, Finvest Panama, Leati, and Lombardfin S.p.A. are permanently enjoined from violating the antifraud provisions of the United States securities laws and regulations.

The foregoing shall constitute the findings of fact and conclusions of law required under Rule 52(a), Federal Rules of Civil Procedure. A decree in separate form, without reciting the prior proceedings, *see* Rule 54, should be submitted on ten (10) days notice, within thirty (30) days hereof.

So Ordered.